Leonard D. FRYE, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 82A04–0102–CR–56.

Court of Appeals of Indiana.

Oct. 11, 2001.

Transfer Denied Dec. 20, 2001.

Jon Aarstad, Vanderburgh County Public Defender Agency, Evansville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Leonard D. Frye appeals his conviction of Possession of Cocaine or Narcotic Drug,[1] a class C felony, Resisting Law Enforcement,[2] a class A misdemeanor, and Visiting or Maintaining a Common Nuisance,[3] a class B misdemeanor. Frye presents the following restated issues for review:

---

1. Ind.Code Ann. § 35–48–4–6 (West Supp. 2000).

2. Ind.Code Ann. § 35–44–3–3 (West Supp. 2000).

3. IC § 35–48–4–13 (West Supp.2000).

1. Was the cocaine found upon Frye's person inadmissible in evidence because it was obtained as a result of a search that violated Frye's constitutional rights?
2. Was the evidence sufficient to prove that the amount of cocaine found in Frye's possession weighed at least three grams?
3. Was the evidence sufficient to sustain Frye's conviction for visiting a common nuisance?

We affirm.

The facts favorable to the convictions are that on July 27, 2000, Detective Tony Johnson and other members of the Evansville Police Department's narcotics unit were observing houses that they suspected were involved with illegal drug activity. Detective Johnson observed that there were several individuals standing outside one of those houses, a residence located at 1506 S. Governor. He also observed that other people would drive up to the residence, get out of their vehicle, and walk up to the residence. After a few minutes, the individuals would return to their vehicle and drive away. Johnson watched as Steven Epstein followed this pattern, and noted that Epstein's thumb and forefinger were pinched together as he returned to his car. Detective Johnson also saw that Epstein opened his car door using only the other three fingers. As Epstein drove away, Detective Johnson radioed Detective Eric Hackworth, who was located nearby, and advised him of what he had seen and gave him a description of Epstein's vehicle. Detective Hackworth followed Epstein and observed that he was driving erratically and then failed to stop at an intersection. As a result, Detective Hackworth executed a traffic stop.

Detective Hackworth asked Epstein to get out of his vehicle and then sought and received permission to search Epstein's vehicle. During the subsequent search, police discovered cocaine. Upon questioning, Epstein admitted that he had just purchased the cocaine at 1506 S. Governor and he described the man who had sold it to him as a young black male wearing a white t-shirt and blue shorts or sweat pants. Detective Hackworth radioed officers conducting surveillance at 1506 S. Governor and relayed the description of the seller. At that time, Detective Johnson and several other officers decided to approach the house and investigate. Detective Johnson saw two black males standing in the yard, of whom one was later identified as Frye. As the officers approached, they identified themselves as police officers. When they did so, Frye began running toward the house. Detective Johnson ordered Frye to stop, but Frye ignored the command and entered into the house. Two other officers kicked in the back door and followed Frye inside.

Upon entering, the officers encountered several individuals in the living room, including Frye. For their own safety, the officers then went from room to room in order to gather together all of the occupants of the house. While doing so, the officers observed marijuana, marijuana and cocaine pipes, and other drug paraphernalia. Everyone in the house was placed under arrest. At that point, Frye was taken into a bedroom and ordered to remove his clothes and submit to a strip search. During the search, Detective Johnson found a plastic baggie concealed between Frye's buttocks. When Detective reached for a pair of gloves to be used in retrieving the baggie, Frye took the baggie and stuck it in his mouth. After a brief struggle, Detective Johnson retrieved the baggie from Frye's mouth and threw it to the side. Frye continued struggling for a "couple of minutes", after which he was subdued. *Record* at 181. Tests later de-

termined that the baggie in Frye's mouth contained cocaine. Frye was convicted as set out above following a jury trial.

### 1.

Frye sought to suppress all evidence flowing from his arrest upon grounds that it was the fruit of an illegal search and seizure.

A claim of illegal search and seizure arises under the Fourth Amendment to the United States Constitution. That provision imposes a standard of reasonableness upon the discretion of law enforcement agents in order to protect individual privacy from arbitrary invasions. *See Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). A search conducted without a warrant issued by a judicial officer is per se unreasonable under the Fourth and Fourteenth Amendments unless it falls into one of the recognized exceptions to the warrant requirement. *Burkett v. State,* 736 N.E.2d 304 (Ind.Ct.App.2000). The State bears the burden of proving that a warrantless search falls within one of the aforementioned exceptions, which our courts strictly construe. *Id.*

The State contends that the initial stop of Frye was permissible pursuant to the investigative stop exception. Under this exception, "a police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity may be afoot, even if the officer lacks probable cause." *Burkett v. State,* 736 N.E.2d at 306 (quoting *Santana v. State,* 679 N.E.2d 1355, 1359 (Ind.Ct.App.1997)). The facts supporting a reasonable suspicion that criminal activity is afoot must rise to "some minimum level of objective justification" in order for the temporary detention of a person to be valid. *Burkett v. State,* 736

N.E.2d at 306 (quoting *Reeves v. State,* 666 N.E.2d 933, 936 (Ind.Ct.App.1996)). We must consider the totality of the circumstances in order to evaluate whether an officer had a reasonable suspicion. *Id.* Moreover, we are mindful that even if the initial stop under this exception was justified by reasonable suspicion, such only permits the officer to temporarily freeze the situation for inquiry; it does not confer upon the officer all the rights attendant to an arrest. *Id.* Although we generally review a trial court's decision to admit evidence under an abuse-of-discretion standard, we review de novo the ultimate determination of reasonable suspicion. *Id.*

Detective Johnson testified that, on the day in question, the house at 1506 S. Governor had been under surveillance for suspicion of illegal drug activity. Police observed as Epstein drove up to the house and thereafter acted in a manner consistent with participation in an illegal drug purchase. When he was stopped shortly after leaving the house, Epstein was searched and found to be in possession of cocaine. Epstein told Detective Hackworth that he had just purchased the cocaine from someone at 1506 S. Governor. He described the man as a tall, slender, young black male wearing a white t-shirt and blue shorts or sweat pants.

When Detective Johnson decided to approach the house after receiving the information from Detective Hackworth, he noted that there were two black males in the yard, one of them wearing a white t-shirt and blue shorts. The police surveillance, combined with the information provided by Epstein through Detective Hackworth, was sufficient to arouse a reasonable suspicion in the officers that criminal activity was afoot at the house at 1506 S. Governor, and thus to justify a brief detention for investigative purposes of the individu-

als standing outside the residence. *See Burkett v. State,* 736 N.E.2d 304.

As Detective Johnson approached, the man in the white t-shirt ran into the house when police officers identified themselves and thereafter refused to stop when ordered to do so by Johnson. We must now determine whether police officers were justified in pursuing Frye into the house.

 We note here that, when reviewing a trial court's ruling on the validity of a search and seizure, we consider the evidence most favorable to the ruling and any uncontradicted evidence to the contrary in order to determine whether there is sufficient evidence to support the ruling. *Melton v. State,* 705 N.E.2d 564 (Ind.Ct. App.1999). If there is a conflict in such evidence, we consider only the evidence favorable to the ruling and will affirm if the ruling is supported by substantial evidence of probative value. *Id.*

 The Fourth and Fourteenth Amendments of the United States Constitution protect persons from unreasonable government intrusions into areas of an individual's life in which he or she has a reasonable expectation of privacy. *Shepherd v. State,* 690 N.E.2d 318 (Ind.Ct.App. 1997), *trans. denied.* Exceptions to the requirement of a search warrant include cases in which police are reasonably concerned about the actual or imminent destruction or removal of evidence before a search warrant may be obtained. *Harless v. State,* 577 N.E.2d 245 (Ind.Ct.App.1991).

 After Detective Johnson executed the investigatory stop, Frye fled into a private residence. In so doing, Frye ig-nored Johnson's command to stay outside the house. Under the circumstances then known to Detective Johnson, this behavior was certainly suspicious and could fairly be characterized as flight in Johnson's eyes. *See Platt v. State,* 589 N.E.2d 222 (Ind. 1992). This act would have served to heighten Detective Johnson's already reasonable suspicion that criminal activity was afoot. Detective Johnson testified that he feared Frye had entered the residence in order to destroy evidence. Under the circumstances, his fear was both objective and reasonable. Such imminent destruction constituted an exigent circumstance that justified a warrantless entry into the house at 1506 S. Governor. *See Middleton v. State,* 714 N.E.2d 1099 (Ind.1999); *see also cf. Cox v. State,* 696 N.E.2d 853 (Ind.1998) (pursuant to *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), if police spot a suspect and identify themselves when the suspect is in view, they may pursue the suspect into a private residence to complete the arrest).[4]

Once inside the house, police officers saw, "in plain view, .... hundreds of items of paraphernalia, both crack pipes, marijuana, rolling papers, lighters, .everything associated with a crack house." Appendix to Accompany Appellant's Brief at 215. Thereafter, Frye and the other occupants of the house were placed under arrest. Frye was arrested for resisting law enforcement. The State contends that the strip search of Frye was proper under the rationale that an arresting officer may conduct a warrantless search of an arrestee's person incident to a lawful arrest. *Santana v. State,* 679 N.E.2d 1355. Frye coun-

---

4. We stress here that these and similar rulings do not give police unfettered power to make arbitrary or capricious stops and they do not alter what constitutes probable cause. Moreover, such do not, without more, transform an investigatory detention into an arrest with all the rights the police have attendant to an arrest. Rather, in these circumstances, they grant the right to temporarily freeze the situation in order to make investigative inquiry. *Platt v. State,* 589 N.E.2d 222.

ters that the police exceeded the permissible scope of a search incident to arrest when they performed a strip search.

■■■■ The United States Supreme Court has analyzed claims of intrusive body searches under the Fourth Amendment. *See, e.g., Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). The reasonableness of such a search is a threshold determination to be made in ascertaining the legality of a body search. *Id.* Whether the right to be free from unreasonable searches has been violated under the Fourth Amendment depends upon the facts and circumstances of each individual case. *Id.; Conwell v. State,* 714 N.E.2d 764 (Ind.Ct.App.1999).

■■■■ We wish to make clear at this juncture that the strip search of Frye was not justified, on the facts of this particular case, upon the basis that it was incident to a lawful arrest. An officer may arrest a person without a warrant if the officer has "probable cause to believe the person is committing or attempting to commit a misdemeanor in the officer's presence . . . ." Ind.Code Ann. § 35–33–1–1(a)(4) (West Supp. 2000). An officer need not obtain a search warrant if the search is conducted incident to such lawful arrest. *Sears v. State,* 668 N.E.2d 662 (Ind.1996). It must be remembered, however, that this exception to the warrant requirement is narrowly tailored and designed to protect the officers and to prevent the destruction of evidence. *Haley v. State,* 696 N.E.2d 98 (Ind.Ct.App.1998), *trans. denied.* Implicit also in this is the principle that there must be a sense of proportionality between the offense for which the individual is arrested and the scope of the search. *See Edwards v. State,* 750 N.E.2d 377 (Ind.Ct.App.2001) (Sullivan, J., concurring in part and dissenting in part). Detective Johnson testified that, initially, Frye was placed under formal arrest for fleeing a police officer.

Thus, an arrest for fleeing from a police officer, would not by itself justify a strip search. Additional facts were present in the instant case, however, that rendered the strip search permissible.

■■■■ After Frye was detained for fleeing from the police officers, officers discovered illegal drugs and drug paraphernalia lying in plain view around the house into which he fled. This, in combination with the circumstances that served as the basis for the investigative stop in the first place, were sufficient to support a reasonable suspicion on the part of the arresting officers that Frye was in possession of contraband. This, in turn, justified a more expansive search commensurate with the nature of that reasonable suspicion. *See, e.g., Kenner v. State,* 703 N.E.2d 1122 (Ind.Ct.App.1999), *trans. denied; cf. Santana v. State,* 679 N.E.2d 1355 (although probable cause does not exist when an officer initially stops a suspect to investigate, probable cause to arrest may develop during the investigation). Indeed, Detective Johnson testified that he feared Frye was about to destroy evidence when he ran into the house at 1506 S. Governor. Under these particular circumstances, the strip search of Frye did not exceed the permissible scope established by, and therefore was not unreasonable under, either the Fourth Amendment of the United States Constitution or article 1, section 11 of the Indiana Constitution. Therefore, the trial court did not err in permitting the cocaine discovered during the strip search to be introduced into evidence.

2.

■■■ Frye contends that the evidence was insufficient to prove that the cocaine found in his possession weighed at least three grams. Specifically, he contends that the State failed to prove the accuracy

of the forensic laboratory scales used to measure the quantity of cocaine.

It is true that in *Robinson v. State,* 634 N.E.2d 1367 (Ind.Ct.App.1994), we held that the State must prove that the scale used to weigh an illicit substance was tested for accuracy before and after its use. Frye is correct in claiming that such was not done in this case. We note, however, that this court has also determined that the failure to object to the evidence of the illicit drug's weight waives the issue for purposes of appeal. *Guadian v. State,* 743 N.E.2d 1251 (Ind.Ct.App.2001), *trans. denied.*

In the instant case, Frye offered no challenge at trial to the State's evidence pertaining to the weight of the cocaine found upon him. Rather, he first raised the issue in a motion to correct error that was filed two weeks after trial. Such was not sufficient to preserve the issue and it is waived.

### 3.

■ Frye contends that the evidence was insufficient to sustain his conviction for visiting a common nuisance. Frye's claim upon this issue is two-fold. First, he did not intentionally visit the house at 1506 S. Governor; rather, he was *chased* into the house by police officers. Second, he contends that there was insufficient evidence to prove that he knew the house contained drugs, primarily because there were not drugs or paraphernalia in the rooms through which he traveled after entering the house.

■ When evaluating the sufficiency of the evidence, we apply a well-settled standard of review. We do not reweigh evidence or judge anew witness credibility. Rather, considering only the evidence and reasonable inferences drawn therefrom that support the verdict, we will affirm the conviction if there is probative evidence

from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Albrecht v. State,* 737 N.E.2d 719 (Ind.2000).

With respect to Frye's first claim, the evidence favorable to the conviction shows that Frye entered the house voluntarily in an attempt to evade police. Thus, there is evidence demonstrating that Frye's entry into the house was not inadvertent, involuntary, or coerced in any manner. The constraints of our standard of review compel us to decline Frye's invitation to second-guess the jury by focusing upon different evidence and drawing different inferences than did the factfinder. The evidence was sufficient to support the conclusion that Frye entered the house voluntarily.

As to Frye's second contention, the evidence belies his claim of ignorance. The sheer quantity of illegal drugs and drug paraphernalia lying around the house, coupled with the facts that Frye voluntarily sought refuge in the house and was found in possession of a baggie of cocaine, were sufficient to support a reasonable inference that he knew that the house was "used by any person to unlawfully use a controlled substance." IC § 35–48–4–13(a).

Judgment affirmed.

SULLIVAN, J., concurs.

RILEY, J., dissenting with separate opinion.

RILEY, Judge, dissenting.

I respectfully dissent from the majority's conclusion that the trial court did not err in permitting the cocaine discovered during the strip search to be introduced into evidence.

As the majority notes, subject to a few well-delineated exceptions, searches and seizures conducted outside of the judicial

process are *per se* unreasonable under the Fourth Amendment to the United States Constitution. *Stalling v. State*, 713 N.E.2d 922, 924 (Ind.Ct.App.1999).

The exception at issue here is the investigatory stop exception. An investigatory stop of a person is constitutionally permissible only when an officer has reasonable suspicion of criminal activity. *Polk v. State*, 739 N.E.2d 666, 668 (Ind.Ct.App. 2000). "Reasonable suspicion exists if there are specific and articulable facts which lead a police officer to believe that criminal activity has occurred or is about to occur." *Id.* "Based on the totality of the circumstances, the detaining officer must have a particularized and objective basis for suspecting the particular person stopped of engaging in criminal activity." *Reeves v. State*, 666 N.E.2d 933, 934 (Ind. Ct.App.1996). Indiana has adopted this rationale for the purpose of determining the legality of an investigatory stop under Ind. Const. art. 1, § 11. *State v. Belcher*, 725 N.E.2d 92, 94 (Ind.Ct.App.2000), *reh'g denied, trans. denied.*

In general, we review a trial court's decision to admit evidence despite a motion to suppress under an abuse of discretion standard. *Burkett*, 736 N.E.2d at 306. However, the ultimate determination of reasonable suspicion is reviewed *de novo*. *Id.*

While the police officers suspected criminal activity at 1506 S. Governor, none of the officers involved had reasonable suspicion of criminal activity in relation to a particular person. At the hearing on Frye's Motion to Suppress, Detective Hackworth was asked if he remembered whether or not Epstein described the individual who sold him the cocaine. Detective Hackworth testified that Epstein described the individual as a "black guy, wearing a white tank top." (Appellant's Appendix at 105). Detective Hackworth

also testified that he conveyed this information to Detective Johnson. However, Detective Johnson testified that Detective Hackworth described the person who sold Epstein the cocaine as a "black male." (Appellant's Appendix at 64).

Furthermore, at trial, on cross examination, the following exchange took place between Frye's counsel and Detective Johnson:

Q. The white male stated to Officer Hackworth that he had just bought the cocaine from someone at 1506 South Governor, and the subject had a quarter ounce of cocaine. Now, that is from a document that you wrote?

A. Yes.

Q. And are those your words?

A. Yes.

Q. And to the best of your recollection that's the events of that evening?

A. Yes it is.

Q. Someone?

A. Someone.

\* \* \*

Q. And you have no recollection of hearing Officer Hackworth tell you that Epstein gave a particular description?

A. I did not hear a description.

(Appellant's Appendix at 243–244, 246–247).

Officer Philip Leuke, Detective Robert Hahn, and Detective Cliff Simpson accompanied Detective Johnson when the decision was made to approach the rear of 1506 S. Governor. Officer Leuke testified at the hearing on Frye's Motion to Suppress that there were a lot of complaints that drug dealing was going on at 1506 S. Governor. Officer Leuke also testified that he was aware of an officer stopping a

vehicle. Detective Hahn also testified at the hearing. Detective Hahn did not testify as to any knowledge of a black male in a white tank top selling cocaine to Epstein. In fact, Detective Hahn did not testify as to any knowledge of Detective Hackworth's stop of Epstein.

At trial, Detective Hahn testified that Sergeant Lauderdale, the supervisor on the scene, made the decision to approach the back of 1506 S. Governor. When asked if Sergeant Lauderdale was on the scene when the officers approached 1506 S. Governor, Detective Hahn testified that he was not sure. Detective Simpson also testified at the trial. Detective Simpson testified that he was present at the arrest at 1506 S. Governor. However, Detective Simpson did not testify as to any knowledge of a black male in a white tank top selling cocaine to Epstein, nor did he testify as to any knowledge of Detective Hackworth's stop of Epstein.

Of the four police officers who approached 1506 S. Governor on July 27, 2000, one officer, Detective Johnson, knew that Epstein purchased cocaine from either a "black male" or "someone" at 1506 S. Governor. (Appellant's Appendix at 64 & 243–244). Officer Leuke seemed to be aware of Detective Hackworth's stop of Epstein. However, he did not seem to have any knowledge of the details of the stop. Detectives Hahn and Simpson did not testify as to any knowledge of Detective Hackworth's stop of Epstein. The only officer that had any particularized knowledge of the person who sold the cocaine to Epstein was Detective Hackworth. Detective Hackworth was not one of the officers who approached 1506 S. Governor. In fact, at the time the officers approached the residence, Detective Hackworth was in the process of booking Epstein for possession of cocaine.

Based on the foregoing, I can only assume that the four officers who approached 1506 S. Governor intended, at best, to conduct an investigatory stop of every black male at the residence. Thus, I cannot find that any of the four officers who approached 1506 S. Governor on July 27, 2000 had a particularized and objective basis for suspecting any particular person of engaging in criminal activity. *See Reeves,* 666 N.E.2d at 934. Without more particularized knowledge of the person who sold Epstein the cocaine or a search warrant, it would be my determination that the officers should never have approached the residence.

Because I do not believe that the officers' conduct falls within the investigatory stop exception to a search warrant, I next look to whether the evidence obtained from the search of Frye should be excluded as the "fruit of the poisonous tree." The "fruit of the poisonous tree" doctrine bars the admissibility in a criminal proceeding of evidence obtained in the course of unlawful searches and seizures. *Hanna v. State,* 726 N.E.2d 384, 389 (Ind.Ct.App. 2000). "To invoke the doctrine, a defendant must show that challenged evidence was obtained by the State in violation of the defendant's Fourth Amendment rights. Stated differently, the defendant must show that the search or seizure was illegal in the first instance." *Id.*

The arrest and search of Frye were illegal in the first instance. Accordingly, I would find that any evidence or testimony concerning Frye's possession of cocaine, resisting law enforcement, and/or visiting or maintaining a common nuisance should not have been admitted in the criminal proceeding against him, as it is "fruit of the poisonous tree." Therefore, I dissent.